IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

UNITED STATES OF AMERICA,      )
                               )
          Plaintiff,           )    Crim. No. 02-60113-AA
                               )
      vs.                      )
                               )
WILLIAM CAMERON,               )    OPINION AND ORDER
                               )
          Defendant.           )
_____)

Karin Immergut
United States Attorney
District of Oregon
Kirk A. Engdall
Assistant United States Attorney
701 High Street
Eugene, Oregon 97401
    Attorneys for plaintiff

Terri Wood
Law Office of Terri Wood, P.C.
730 Van Buren Street
Eugene, Oregon 97402

Shaun S. McCrea
McCrea, P.C.
1147 High Street
Eugene, Oregon 97401-3270
    Attorneys for defendant


1 - OPINION AND ORDER

AIKEN, Judge:

Defendant is charged with being an ex-felon in possession of a firearm under the Armed Career Criminal Act (ACCA), 18 U.S.C. §§ 922(g)(1) and 924(e)(1). Defendant moves a second time to dismiss the indictment and to suppress evidence derived from a stop, including any statements and all physical evidence. On November 4, 2003, the court held a hearing on defendant's initial motions, where defendant appeared via video-conferencing. The court heard witness testimony and admitted evidence. After the hearing, the court allowed supplemental briefing by both parties. On March 1, 2004, the court denied defendant's motions.

In April 2006, defendant filed a second round of motions to dismiss and to suppress evidence. The parties sought several extensions of the briefing schedule, and on October 30, 2006, defendant filed a supplemental motion to suppress. On October 31, 2006, the court held an evidentiary hearing and heard witness testimony. After the hearing, the court allowed the government an opportunity to respond to defendant's supplemental motion. Defendant's motions are denied.

<u>BACKGROUND</u>

Although the facts of this case were recited in my previous order, I do so again for purposes of defendant's renewed motions.

On March 31, 2002, Sarah Cooper was robbed and raped at knife point by Robert Cameron, defendant's brother, while working alone

at the Great Western Pub in Cottage Grove, Oregon. Cottage Grove Police Officers, including Corporal (Cpl.) Dean Finnerty arrived at the scene in response to Cooper's telephone call. After questioning Cooper, the police attempted to locate Robert Cameron. Cpl. Finnerty had been advised by an informant that Robert Cameron and defendant were seen together approximately forty-eight hours prior to the robbery and rape. The informant also said that Robert had been seen in possession of handguns which were believed to be firearms stolen from the home of the Cottage Grove Police Chief.

On April 1, 2002, Cpl. Finnerty continued to search for Robert Cameron. Cpl. Finnerty knew that Robert's girlfriend, Donna King, recently had been seen by police officers leaving Robert Cameron's residence. Shortly after 10:00 a.m., while looking for Donna King, Cpl. Finnerty saw defendant walking southbound on North 9th Street in Cottage Grove. When Cpl. Finnerty attempted to speak to defendant, defendant ran away. Cpl. Finnerty yelled to defendant that he only wanted to speak to him and that he was not under arrest, but defendant continued to run, looking back over his shoulder several times. Cpl. Finnerty followed defendant in his marked patrol car until defendant ran through an open gate, tripped, and fell. As defendant rose to his knees, Cpl. Finnerty noticed his hands moving towards the front waistband of his pants, as if defendant was attempting to retrieve a weapon. Cpl. Finnerty drew his weapon and pointed it at defendant. After Cpl. Finnerty

3 - OPINION AND ORDER

ordered defendant to stay on the ground and show him his hands, defendant dropped a handgun on the ground between his legs.

Cpl. Finnerty testified that defendant told him that he "could go back to prison," motioning with his head towards the gun laying on the ground, adding that if he went back to prison "he would be killed" due to his "snitch jacket." Cpl. Finnerty told defendant that he did not care about the gun, that dispatch had informed him that there were no outstanding warrants for his arrest, and that he did not intend to arrest defendant. Cpl. Finnerty testified that he repeatedly told defendant that he only wanted to talk to him about his brother, and that the gun was a "non-issue."

Cpl. Finnerty eventually handcuffed defendant and placed him in the back of a patrol car. Cpl. Finnerty asked defendant if he had other weapons on him, and defendant responded that he had some syringes in his coat pocket. Cpl. Finnerty told defendant that he did not care about the syringes or "any dope," again telling defendant that his only interest was getting Robert Cameron picked up before he or a police officer got hurt or killed. Cpl. Finnerty then recovered the handgun from where defendant had dropped it and transported defendant to the police station.

At the police station, Cpl. Finnerty conferred with Cottage Grove Police Commander White. Cpl. Finnerty explained to White that defendant had been in possession of a firearm at the time of the stop, and that defendant may be able to assist in locating

4 - OPINION AND ORDER

Robert Cameron.  Commander White authorized Cpl. Finnerty to tell defendant that no firearms charges would be filed against him if he cooperated and provided truthful information about Robert Cameron.

Defendant was advised by Cpl. Finnerty that if he told the police where his brother could be found, Finnerty was authorized by his Commander to see that no charges were filed against him for his unlawful possession of the firearm.  Defendant agreed to cooperate and told Cpl. Finnerty that Robert Cameron was staying at a motel. When officers arrived at that motel, they confirmed that Robert Cameron had been staying there but that he had vacated his room earlier that morning.  Later that day, Robert Cameron was shot and apprehended in Eugene, Oregon.  Defendant was released from custody and was not charged with any firearm violations.

The next day, it was discovered that defendant had an outstanding arrest warrant for an alleged probation violation unrelated to the April 1, 2002 incident.  On April 2, 2002, at approximately 2:10 p.m., defendant was arrested by Cottage Grove Police on the warrant.  While being transported to the Lane County Jail, defendant yelled that he was "fucked" by Cpl. Finnerty after he had provided information about his brother.

Approximately one week later, Lane County Deputy District Attorney Erik Hasselman spoke with Cpl. Finnerty.  Cpl. Finnerty remarked to Hasselman that defendant was "lucky" both brothers were not shot on April 1, 2002 and described his encounter with

defendant.   Cpl. Finnerty advised Hasselman that he had promised defendant that he would not be charged with firearm possession if defendant gave truthful information regarding the whereabouts of his brother.   Hasselman testified that he told Cpl. Finnerty, "if it is that important to you that you maintain your credibility with your informants, I will respect your wishes and not prosecute him."  Hasselman further testified that the Lane County District Attorney's Office agreed not to prosecute defendant on firearms charges.

Hasselman subsequently contacted Eugene Police Detective Terry Willis.   Det. Willis serves as a liaison between Lane County and federal law enforcement authorities under "Project Triggerlock," a joint undertaking between state and federal law enforcement authorities to identify and refer criminal offenders to federal authorities for firearms prosecution.  Det. Willis screens firearms cases that qualify for federal prosecution, and once a case is referred for federal prosecution, the Bureau of Alcohol, Tobacco, and Firearms (ATF) takes over as the charging agency.

Hasselman told Det. Willis about defendant's firearm possession and requested a background check on defendant. Hasselman knew that Robert Cameron had threatened to kill Cooper if she called the police and had also told Cooper that his brothers would come back for her.   In light of defendant's possession of a firearm, Hasselman was concerned about the potential for

retaliation and witness tampering.  Det. Willis discovered that defendant's prior criminal record rendered him "a potential armed career criminal candidate." Det. Willis then contacted Cpl. Finnerty and requested a police report regarding the incident with defendant on April 1, 2002.  Cpl. Finnerty refused, citing his agreement with defendant.

On April 10, 2003, Hasselman, Willis and Assistant United States Attorney Kirk Engdall, met to discuss a federal prosecution of Robert Cameron as an Armed Career Criminal (ACC).  Det. Willis testified that the stated purpose of the meeting was to discuss both defendant and his brother, the state charges pending against them, and any possible federal charges that could be filed against them.  Det. Willis advised AUSA Engdall of defendant's prior criminal history, defendant's possession of the handgun, the circumstances of defendant's arrest, and the promise made to defendant by Cpl. Finnerty.  Hasselman also advised that the State had agreed not to prosecute defendant for firearms violations. Nonetheless, based on defendant's prior criminal history, it was decided that defendant qualified for ACC prosecution.

Det. Willis told Hasselman about Cpl. Finnerty's refusal to prepare a police report regarding the incident with defendant on April 1, 2002, and the need to obtain a report in order to refer the case for federal prosecution.  Hasselman agreed to contact the Cottage Grove Police and request a police report of the incident.

Hasselman ultimately spoke with Cpl. Finnerty's commander, who ordered Finnerty to prepare the report.

On April 22 or 23, 2002, the case was assigned to ATF Agent Roland Jacobs for further investigation. Jacobs reviewed defendant's criminal history, viewed the scene and interviewed officers, and retrieved the firearm for fingerprint analysis.

On November 13, 2002, evidence was presented to a federal grand jury in Eugene, Oregon, and an indictment charging defendant with felon in possession of a firearm under the ACCA was filed with this court.

<u>DISCUSSION</u>

<u>I.  MOTIONS TO DISMISS</u>

Defendant renews his motion to dismiss the indictment based on promises made to defendant by the Cottage Grove Police department that he would not be charged with possession of a firearm if he agreed to cooperate and provide truthful information about his brother, Robert Cameron.

In his previous motion, defendant argued that promises made by state authorities may be binding on federal prosecutors if the state and federal prosecutions are related. Defendant maintains that his original motion did not allege or argue that defendant relied on Cpl. Finnerty's promise or that an agency relationship existed between State and federal government officials when selecting defendant for prosecution as an ACC. Instead, defendant

argued that if state and federal prosecutions are "inextricably intertwined," they may be considered to be one continuous prosecution rather than separate prosecutions, so that the actions of state authorities bind federal authorities.  See <u>United States v. Martinez</u>, 972 F.2d 1100, 1105 (9th Cir. 1992); <u>United States v. Hines</u>, 963 F.2d 255, 257-58 (9th Cir. 1992).

The court denied defendant's motion:

> Based on the current law that binds this court, I cannot hold that the federal prosecutor is barred from initiating a federal prosecution based on a state agent's promise to the defendant that he would not be prosecuted. The Ninth Circuit clearly requires an agency relationship between the state and federal prosecutors in order for the state agent's promise to bind the federal prosecutor. Further, Ninth Circuit law discussing the doctrine of "inextricably intertwined" prosecutions focuses exclusively on the denial or circumvention of a defendant's Sixth Amendment right to counsel, a fundamental and constitutionally protected right.  The Ninth Circuit has not yet extended the doctrine to include protection from federal prosecution for a "promise" made by a state agent to a defendant that does not involve the denial of a constitutionally protected right.  Here, in exchange for a promise of no prosecution, the defendant provided law enforcement with information about his brother's location.  There is no evidence that the defendant incriminated himself with this information, that he was denied counsel, or denied any constitutional right.  I am unable to find any authority that would support an analysis of defendant's action under the <u>Martinez</u> "inextricably intertwined" doctrine.  <u>See also</u>, <u>United States v. Williams</u>, 780 F.2d 802 (9th Cir. 1986) (promise made by government employee other than United States Attorney to recommend dismissal of indictment cannot bind the United States Attorney).

Opinion, March 1, 2004, pp. 11-12.

Defendant now argues that the fundamental fairness component of the Due Process Clause of the Fifth and Fourteenth Amendments

compels dismissal of the indictment, because defendant fulfilled his obligation under the cooperation agreement and an agency relationship existed between the State and federal authorities. Alternatively, defendant requests that the court dismiss the indictment under its inherent supervisory powers, even if the court finds no violation of defendant's constitutional rights. Finally, defendant moves for dismissal on several grounds associated with police and prosecutorial misconduct.

## A.  Due Process

### 1.  Fundamental Fairness

Defendant argues that the State breached its cooperation agreement and violated his rights to due process by requesting federal prosecution on a charge for which he had been promised immunity, and that the State compounded that breach by providing the government with the evidence needed to prosecute defendant. Thus, defendant maintains that because he fulfilled his part of the agreement and cooperated with the State's investigation of his brother, the doctrine of fundamental fairness requires the federal government to scrupulously honor the bargain made with defendant. See Mabry v. Johnson, 467 U.S. 504, 509 (1984).

The government maintains that the principal of fundamental fairness is inapplicable in this case, because the federal government played no part in Cpl. Finnerty's cooperation agreement with defendant. The government emphasizes that Cpl. Finnerty

10 - OPINION AND ORDER

lacked authority to enter into a cooperation agreement on behalf of the federal government, and therefore, his agreement with defendant cannot bind or be imputed to the federal government. Further, the government contends that defendant fails to establish detrimental reliance so as to support dismissal of the indictment on grounds of fundamental fairness.

It goes without saying that the facts of this case and the government's pursuit of defendant as an ACC are somewhat troubling. Cpl. Finnerty made a promise to defendant and intended to make good on his promise after defendant provided truthful information regarding his brother. Indeed, Cpl. Finnerty refused to write an incident report to facilitate federal prosecution of defendant until ordered to do so by his commander. Further, Cpl. Finnerty made the promise with the belief and understanding that it would by honored by the State, if not federal, prosecuting authorities. In fact, the Lane County District Attorney's Office honored Cpl. Finnerty's promise and did not prosecute defendant on state firearms charges. Yet, defendant faces prosecution under the ACCA.

As a result, Cpl. Finnerty's credibility, like that of other police officers, will be in question when assurances or promises are made to criminal suspects in exchange for information critical to the investigation and apprehension of dangerous offenders. Particularly in small communities, law enforcement officers likely rely on informal cooperation agreements with informants to acquire

11 - OPINION AND ORDER

such information.  If officers and informants can no longer rely on these informal agreements, informants may not be inclined to provide information, thus squelching an important source of investigation.

Ultimately, however, it is not the court's role to evaluate or comment on the wisdom of the State's or the federal government's actions.  Rather, I must determine whether the government's prosecution of defendant, despite the promise made by Cpl. Finnerty, violates defendant's rights to due process.  I find that it does not.  Though appealing is the notion of holding the federal government to the deal made by Cpl. Finnerty, "there's just no way to get from here to there, at least not without uprooting much established law and many commonly-held assumptions about how the government works."  Thomas v. Immigration & Naturalization Serv., 35 F.3d 1332, 1348 (9th Cir. 1994) (Kozinski, J., dissenting).

It is well-settled under the fundamental fairness doctrine that "when the government makes a promise that induces someone to relinquish constitutional or other substantial rights, that promise must be fulfilled." Ramallo v. Reno, 931 F. Supp. 884, 892 (D.D.C. 1996); Santobello v. New York, 404 U.S. 257, 262 (1971) ("[W]hen a plea rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be part of the inducement or consideration, such promise must be fulfilled.").  The Ninth Circuit has applied the law governing enforceability of plea

12 - OPINION AND ORDER

bargains to "cooperation agreements" and authorized dismissal of an indictment as a remedy for breach of the government's promise not to prosecute, affirmatively finding that this remedy is "not outside the district court's discretion." United States v. Carrillo, 709 F.2d 35, 37 (9th Cir. 1983) ("Inasmuch as an obligation to testify did not become a condition [of the cooperation agreement] and because Carrillo fulfilled all other obligations under the agreement, under settled notions of fundamental fairness the government was bound to uphold its end of the bargain.").

Defendant relies primarily on the contract principles cited in Carrillo to argue that fundamental fairness requires enforcement of Cpl. Finnerty's promise. Defendant's argument is based on his contention that the State entered into a valid cooperation agreement with defendant, and that the State breached this agreement by referring defendant for federal prosecution as an ACC. Defendant emphasizes that he fully performed under the agreement, and having obtained his cooperation, the federal government must honor the agreement made by the State. United States v. Transfiguracion, 442 F.3d 1222, 1235 (9th Cir. 2006) ("Once defendants upheld their end of the [plea] agreement, the government did obtain bargained-for consideration, and was therefore precluded from prosecuting[.]"). In other words, defendant seeks to remedy the State's alleged breach by imputing the violation of his due

13 - OPINION AND ORDER

process rights to the federal government. However, defendant cites no binding authority to support this argument, and in fact, several courts have found to the contrary.[1]

Generally, "a defendant who seeks specifically to enforce a promise, whether contained in a plea agreement or a freestanding cooperation agreement, must show both that the promisor had actual authority to make the particular promise and that [the defendant] detrimentally relied on it." United States v. Flemmi, 225 F.3d 78, 84 (1st Cir. 2000) (citing cases); United States v. Williams, 780 F.2d 802, 803 (9th Cir. 1986) (per curiam). In such cases, where the defendant has performed in accordance with the agreement, principles of contract law and "fundamental fairness" require enforcement of the agreement against the government. See Transfiguracion, 442 F.3d at 1235; Carrillo, 709 F.2d at 36; see also United States v. Aguilera, 654 F.2d 352, 354 (5th Cir. 1981) (per curiam) ("Certainly, when the prosecution makes an agreement within its authority and the defendant relies on it in good faith,

_____

[1]I question whether the State breached the agreement with defendant when Cpl. Finnerty's promise was not authorized by the DA's office. Although Cpl. Finnerty testified that prosecuting authorities always honor his promises to defendants, "this practice does not convert the police into agents having the power to legally bind the prosecutor to such agreements." State v. Reed, 879 P.2d 1000, 1002 (Wash. App. 1994). Here, Hasselman did not authorize or know of Cpl. Finnerty's promise at the time it was made, and Cpl. Finnerty testified that the DA's office had the ultimate authority to grant or withhold immunity. Further, although Hasselman agreed not to bring charges against defendant, he testified that he did so as a "gentlemen's agreement" with Finnerty rather than as a binding promise to defendant.

the court will not let the defendant be prejudiced as a result of that reliance.").

Thus, to enforce Cpl. Finnerty's promise in this proceeding, defendant first must show that Cpl. Finnerty was authorized to offer defendant immunity on behalf of the federal government.  No evidence suggests that Cpl. Finnerty possessed such authority, and "[a]s a general rule, doctrines such as estoppel and apparent authority are not available to bind the federal sovereign." Flemmi, 225 F.3d at 85.  To the contrary, "officials having lesser authority over prosecutions than United States Attorneys" may not "bind the United States either to dismiss an indictment or to refrain from prosecution." Flemmi, 225 F.3d at 87; Williams, 780 F.2d at 803; United States v. McIntosh, 612 F.2d 835, 837 (4th Cir. 1979); see also Johnson v. Lumpkin, 769 F.2d 630, 634 (9th Cir. 1985) ("Nor does [the petitioner] cite authority for the novel proposition that the unauthorized promises of federal agents are binding in state judicial proceedings.  State agents are without authority to bind federal proceedings, and the converse is no less true.") (citations omitted).

In a case with facts similar to the one at bar, the Seventh Circuit held that unauthorized promises by the State could not bind the federal government in the absence of an agency relationship. United States v. Long, 511 F.2d 878 (7th Cir. 1975). After the defendant was arrested for alleged narcotics and firearms

violations, a state law enforcement officer promised the defendant
that he would not be prosecuted for any firearms violation if he
provided information regarding narcotics violations.  Id. at 879-
880.  Despite this agreement, the defendant was charged in federal
court with unlawful possession of a sawed-off shotgun.    The
district court dismissed the indictment based on "fundamental
fairness" and its finding that state "agents who investigate,
arrest, and charge a Defendant with a federal violation are in a
functional sense, and in the eyes of the accused, agents of the
United States."  Id. at 880 (internal quotation marks omitted).

The Court of Appeals reversed:

> In our consideration of this issue we are not indifferent
> to the fundamentally fair treatment which is the
> defendant's due; however, unless an agency relationship
> may be deemed under the facts of the case and the
> established law to have existed, the federal government
> cannot be held bound by the bargain alleged to have been
> made by the state agent, regardless of whether or not
> such a bargain was in fact made by the state officer.

Id.  The court concluded that the defendant failed to establish an
agency relationship, because the federal government had not
authorized or known of the cooperation agreement made by the state
officer.  Long, 511 F.2d at 881-82.

Likewise, in this case defendant presents no evidence that the
any federal agent either authorized Cpl. Finnerty to enter into a
cooperation agreement with defendant or had knowledge of the
agreement when it was made.  Rather, it is undisputed that the U.S.
Attorney's office *did not* authorize an agreement with defendant,

16 - OPINION AND ORDER

and it is undisputed that no federal agent was involved in
defendant's arrest, detention, or questioning on April 1, 2002.
Therefore, the federal government received no "bargained-for
consideration," and Cpl. Finnerty's promise cannot be enforced
against the federal government on this ground. Transfiguracion,
442 F.3d at 1235.

While "a promise made by a government employee other than the
United States Attorney" cannot bind the federal government,
however, "[a]n exception has been recognized where, although the
United States Attorney was not a party to a cooperation agreement,
breach of the agreement rendered a prosecution fundamentally
unfair." Williams, 780 F.2d at 803 (citing United States v.
Rodman, 519 F.2d 1058, 1059-60 (1st Cir. 1975) (per curiam)); see
also Flemmi, 225 F.3d at 88, n.4 ("A narrow exception to [the
requirement of actual authority] exists when the government's
noncompliance with an unauthorized promise would render a
prosecution fundamentally unfair.").

Thus, "fundamental fairness" may require enforcement of a
promise made by a governmental agent without authority to do so, if
the defendant's reliance on the promise subjects him to subsequent
prosecution or other related detriment. See State v. Bryant, 42
P.3d 1278, 1285-86 (Wash. 2002) (even though Snohomish County was
not bound by immunity agreement defendant reached with King County,
immunity agreement would be enforced and Snohomish County charges

17 - OPINION AND ORDER

dismissed where the defendant's incriminating statements made in reliance on the agreement led to subsequent prosecution); Ramallo, 931 F. Supp. at 892-93 (fundamental fairness doctrine applied to promise to not deport the plaintiff where she "severely compromised her own safety by cooperating with the government," would be in danger if she were deported, and relinquished her right to a full hearing before the Immigration Judge as a result of the cooperation agreement); see also Rowe v. Griffin, 676 F.2d 524, 527-28 (11th Cir. 1982) ("We believe that, as a matter of fair conduct, the government ought to be required to honor [an immunity] agreement when it appears from the record that: (1) an agreement was made; (2) the defendant has performed on his side; and (3) the subsequent prosecution is directly related to offenses in which the defendant, pursuant to the agreement, either assisted with the investigation or testified for the government.").

In my previous opinion, I found "no evidence that the defendant incriminated himself with [information he provided about his brother], that he was denied counsel, or denied any constitutional right." Opinion and Order, p. 12. Nonetheless, defendant argues that he gave up his right to remain silent and to not incriminate himself by answering Cpl. Finnerty's questions about both his brother and the firearm. During his questioning at the jail on April 1, 2002, defendant told Cpl. Finnerty that he obtained the firearm from his brother and that he thought it was

stolen.  However, it is unclear whether this statement was made in reliance on the promise made by Cpl. Finnerty.  Regardless, the government represents that it does not intend to introduce this statement, or any other statement made by defendant while being questioned at the jail on April 1, 2002.  Accordingly, the charges that form the basis of this federal prosecution do not derive from the information provided by defendant under his agreement with Cpl. Finnerty.

In find instructive the reasoning in <u>United States v. Streebing</u>, 987 F.2d 368 (6th Cir. 1993), where the defendant was charged with fraud and making false statements in connection with an alleged scheme to defraud the Social Security Administration. Prior to return of the indictment, the defendant was interviewed by an FBI agent and made inculpatory statements and admissions regarding conduct charged in the indictment.  <u>Id.</u> at 370-71.  The defendant moved to dismiss the indictment based on a promise made by the FBI agent that the defendant would not be prosecuted if he cooperated with investigators and made a statement regarding his fraudulent activities.  <u>Id.</u> at 371.

The Sixth Circuit found that fundamental fairness did not require dismissal of the indictment, in part because the defendant "did not rely to his detriment upon the alleged promise not to prosecute."  <u>Id.</u> at 373.  Specifically, the court found that because the government did not use any information obtained from

defendant against him, the "defendant was in no worse a position at the time of trial than he was at any time prior to or after the interview, and as such, he suffered neither prejudice nor detrimental reliance." Streebing, 987 F.2d at 373. Similarly, defendant here is in no worse position than he was prior to Cpl. Finnerty's promise. Aguilera, 654 F.2d at 354 (where defendant had done nothing to "change his position" as a result of the alleged agreement, there was "no reliance and no prejudice").

Indeed, defendant already had been apprehended in possession of a firearm before Cpl. Finnerty made any promises to him. Thus, defendant "was not induced by the agreement to incriminate himself, to furnish information useful to the government in developing the case against him, or to plead guilty[.]" Williams, 780 F.2d at 803. Further, defendant identifies no other detriment or prejudice that might render a conviction unfair. See id. at 804 (where VA official promised to recommend no charges against defendant in exchange for defendant's resignation from employment at VA hospital, "the only detriment Williams incurred in reliance on [the] promise was the loss of his employment with the VA," for which dismissal of the indictment was "not a proper remedy").

Therefore, I find that defendant fails to establish that his reliance on Cpl. Finnerty's promise caused him prejudice in this prosecution or some other detriment, and fundamental fairness does not require dismissal of the indictment.

2.  Agency Relationship

Defendant also argues that the government's prosecution of him violates his due process rights, because an "agency relationship" existed between the State and federal government when they investigated defendant for ACC prosecution.   Specifically, Defendant contends that, Det. Willis, Hasselman, and AUSA Engdall worked as partners under Project Triggerlock in selecting defendant for federal prosecution, with the State initiating the request and providing the evidence, "and the Government agreeing to prosecute while also expressing a willingness to defer to the State should it change its position."   Motion to Dismiss, p. 19.   Therefore, defendant asserts, an agency relationship existed, whereby the federal government was acting as an agent of the State and bound by the State's promise not to prosecute.

I do not find that Project Triggerlock and the accompanying cooperation between state and federal authorities creates an agency relationship between the State and the federal government, or that the State's referral and the federal government's subsequent prosecution of defendant renders the federal government an agent or tool of the State.   Even though Det. Willis initially reviewed defendant's criminal history at the behest of Hasselman, the investigation was taken over by ATF Agent Roland Jacobs and the U.S. Attorney's Office.   Jacobs and Det. Willis both testified that the federal authorities undertake their own review of referred

cases before pursuing charges, and in this case Jacobs conducted his own review of defendant's case.  Further, defendant identifies no State actors that are involved in this federal prosecution.

Further, I am not persuaded otherwise by the fact that federal authorities knew of Cpl. Finnerty's promise to defendant and Hasselman's agreement to honor that promise.  In other contexts the federal government is permitted to pursue charges against a defendant, even though state prosecution would violate the defendant's constitutional rights.  For example, where state prosecution of a defendant is barred by the Double Jeopardy Clause, the federal government may nonetheless prosecute the defendant for the same criminal conduct as a separate sovereign.  The only exception is where the federal prosecution is a "tool, a sham or a cover" for the state government.  See United States v. Figeroa-Soto, 938 F.2d 1015, 1019 (9th Cir. 1991).  Notably, however, "[c]ollaboration between state and federal authorities is 'the conventional practice,'" and does not amount "to one government being the other's 'tool' or providing a 'sham' or 'cover.'"  Id. at 1020 (quoting Bartkus v. Illinois, 359 U.S. 121, 123 (1959)).  Likewise, the collaboration between the State and federal government in this case does not render the federal government an agent or "tool" of the State.

Accordingly, defendant fails to show that defendant's due process rights were violated by virtue of the State's cooperation

with federal authorities or the existence of an agency relationship between the State and the federal government.

      B.  Supervisory Powers

Alternatively, defendant requests that the court dismiss the indictment, even if no constitutional violation is found, pursuant to the court's supervisory powers. At a minimum, defendant requests that the court prohibit the government from using evidence obtained in violation of his due process rights, including the firearm, defendant's statements, and Cpl. Finnerty's testimony.

"The power of a district court to dismiss a grand jury indictment under the supervisory powers doctrine is premised on the inherent ability of the federal courts to formulate procedural rules not specifically required by the Constitution or Congress to supervise the administration of justice." Streebing, 987 F.2d at 371. However, "in order to invoke this power, a court must first find that the defendant is actually prejudiced by the misconduct." Id. at 372. Here, defendant fails to establish prejudice as a result of the government's failure to honor Cpl. Finnerty's promise. Defendant did not detrimentally rely on Cpl. Finnerty's promise with respect to this prosecution, and the government has agreed that it will not seek to admit any of the statements made by defendant to Cpl. Finnerty while at the jail. Therefore, I find no prejudice and decline to dismiss the indictment under the supervisory powers doctrine.

23 - OPINION AND ORDER

C.  Other Alleged Grounds for Dismissal

Defendant moves to dismiss the indictment based on the "intentional destruction of exculpatory evidence." Defendant alleges that law enforcement officers intentionally processed the firearm and ammunition so as to destroy latent fingerprints and DNA evidence which would indicate that defendant never touched the firearm. I disagree and rely on the November 4, 2003, hearing, where Cpl. Finnerty testified at length regarding his observation of defendant in possession of a firearm upon his arrest. Defendant has offered no evidence that evidence tampering occurred, nor does the record provide the court with any evidence of this occurrence.

Defendant next moves for dismissal based on prosecutorial misconduct, alleging that State and federal prosecutors have targeted him because of bias and the lure of a "high profile" case. Again, defendant presents no evidence to support this allegation.

Defendant also moves to dismiss the indictment based on pre-indictment and pre-trial delay. The court has attempted to move this case along despite the appointment of three different counsel for defendant and the filing of several motions on defendant's behalf by each lawyer. Further, defendant has advised the court during his appearances at status conferences that he did not care about the date of his trial so long as he was allowed to continue filing motions. Defendant's allegation that he is now prejudiced due to the delays in this case is not well founded and will not

24 - OPINION AND ORDER

serve to dismiss the indictment.

Finally, defendant moves to dismiss based on double jeopardy, asserting that the State of Oregon used his possession of the firearm to prosecute him and to enhance his sentences in other pending State of Oregon cases. This issue is properly litigated before the State of Oregon courts, and defendant's motion to dismiss is denied.

II.  MOTION TO SUPPRESS

Defendant again moves to suppress any and all statements made to: (1) Cpl. Finnerty on April 1, 2002; (2) Britton Wayne Munoz on April 2, 2002; (3) Detective Terry Willis or Detective Dave Codding on July 3, 2002; and (4) any other statements made by defendant to law enforcement personnel that the government seeks to introduce into evidence at trial.

At the evidentiary hearing on October 31, 2006, the government represented that it will not seek to introduce any statements made by defendant to Cpl. Finnerty while detained at the jail on April 1, 2002. Additionally, defendant withdrew his motion with respect to Munoz, Willis, and Codding, because the government has identified no incriminating statements made by defendant to any of these individuals. Therefore, defendant's renewed motion to suppress is limited to statements made to Cpl. Finnerty at the time of his initial contact with and subsequent arrest of defendant.

Defendant argues that Cpl. Finnerty had no articulable basis

25 - OPINION AND ORDER

to effectuate a stop, and that defendant was entitled to <u>Miranda</u> warnings once he was in custody.  I adhere to my previous ruling.

On April 1, 2002, Cpl. Finnerty knew that defendant had been seen with Robert Cameron within the past 48 hours; that Robert Cameron had been seen with two firearms within the past 48 hours; and that Robert Cameron had threatened the victim by telling her that if she called the police he would kill her and that he had two brothers that would also come back for her.  Further, Cpl. Finnerty believed that defendant knew where Robert Cameron could be located.  At the same time, Cpl. Finnerty did not believe that he had probable cause to arrest defendant for any crime, as Cpl. Finnerty was unaware that there was an outstanding warrant for defendant's arrest on probation violations.

Regardless, I again find that Cpl. Finnerty's initial contact with defendant was simply an attempt to speak to him with no coercion or threat of arrest.  Although Finnerty was dressed in uniform and driving a marked patrol car, he did not display a weapon or attempt to touch defendant.  Morever, as defendant ran away, Cpl. Finnerty yelled that he only wanted to speak to him and that he was not under arrest.  I find no coercion or detention of defendant, and thus, find Cpl. Finnerty's initial contact with defendant a lawful encounter.

With respect to the actual stop, Cpl. Finnerty testified that when defendant ran from him, he knew "something was wrong.  As soon

26 - OPINION AND ORDER

as he took off running, it was - I knew he had to know where Robert was at or it was - you know, had a gun." Based on the totality of the circumstances known to Finnerty, including defendant's flight, I find that Finnerty had a reasonable suspicion to stop defendant. See Illinois v. Wardlow, 528 U.S. 119, 124 (2000) ("Headlong flight – wherever it occurs – is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such."). As I ruled previously, once Cpl. Finnerty saw defendant reach for his front waistband, he was justified in drawing his weapon and warning defendant. Likewise, once Cpl. Finnerty knew that defendant actually possessed a weapon, he had probable cause to arrest defendant and seize the weapon incident to his arrest. Accordingly, all evidence gained as a result of the stop was gained lawfully and will not be suppressed.

Defendant next argues that he was entitled to Miranda warnings, because he was in custody after he fell and Cpl. Finnerty arrived on the scene. It is undisputed that Cpl. Finnerty did not give defendant Miranda warnings, because he did not intend to arrest defendant. No further evidence or testimony was presented on this issue during the second suppression hearing. Regardless, as I found in my earlier opinion, defendant's statements at the time of his arrest were unsolicited and not the result of custodial interrogation. Therefore, defendant's renewed motion to suppress statements made to Cpl. Finnerty on April 1, 2002, is denied.

27 - OPINION AND ORDER

C.  SUPPLEMENTAL MOTION TO SUPPRESS

Finally, defendant moves to suppress evidence of the gun and any relevant testimony concerning the firearm or ammunition. Defendant maintains that the government withheld evidence by destroying a rag wrapped around the gun and a plastic bag containing bullets, and that the firearm was contaminated because Finnerty logged the firearm as "found property" rather than following standard protocol for the preservation of evidence.

The failure to preserve potentially useful evidence may constitute denial of due process, if the failure was in bad faith. Arizona v. Youngblood, 488 U.S. 51, 58 (1988). Even assuming defendant could show the destruction of evidence, no evidence suggests that any law enforcement officer, particularly Cpl. Finnerty, acted in bad faith. Therefore, this motion is denied.

CONCLUSION

Defendant's motions to suppress statements (doc. 68), supplement to motion to suppress statements (doc. 87), motion to dismiss the indictment (doc. 86), motion to dismiss (doc. 89), and supplemental motion to suppress (doc. 110) are DENIED.

IT IS SO ORDERED.

Dated this  30   day of November 2006.


<u>                              /s/ Ann Aiken                  </u>
Ann Aiken
United States District Judge

28 - OPINION AND ORDER